UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| AMBER CREED a/k/a<br>CHRISTOPHER CREED, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | CASE NO. 3:06-CV-465RM |
| | ) | |
| FAMILY EXPRESS CORPORATION, | ) | |
| | ) | |
| Defendant | ) | |

<u>OPINION and ORDER</u>

This cause is before the court on the motion of Family Express Corporation for summary judgment on Amber Creed's claims against it. Ms. Creed claims that while she was employed by Family Express, she was discriminated against based on her sex when Family Express terminated her for failing to conform with male stereotypes in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq* and Indiana Code § 22-9-1-3. For the reasons that follow, the court grants Family Express's summary judgment motion.

FACTUAL BACKGROUND

The following facts are taken from the summary judgment record and are viewed in the light most favorable to Ms. Creed, the nonmoving party. Ms. Creed suffers from gender identity disorder, a condition in which one exhibits a strong and persistent cross-gender identification (either the desire to be or insistence that one is of the other sex) and a persistent discomfort about one's assigned sex or a

sense of inappropriateness in the gender role of that sex. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders, Text Revision* (DSM-IV-TR) 576 (4th ed. 2000). At birth, Ms. Creed's sex was classified as male. Over time though, she determined that her gender designation didn't correspond with her gender identity, which is female.

Before being hired by Family Express, Ms. Creed started her gender transition. In researching gender identity disorder, Ms. Creed learned that the standards of care for the treatment of the disorder include a therapeutic protocol called the real-life experience, which involves living full time as a member of the sex with which the person identifies. *See* Creed Dec. ¶ 13. After real-life experience in the desired role, the next phases of treatment include hormones of the desired gender and, finally, surgery to change the genitalia and other characteristics. Id. On April 26, 2005, Ms. Creed sought counseling relating to her gender transition and was diagnosed with gender identity disorder. Ms. Creed continued counseling for three sessions or so but stopped going because she couldn't afford the cost.

*Employment History*

Ms. Creed began working as a sales associate at Family Express Store #51 in LaPorte, Indiana on February 14, 2005. When she applied for the position, Ms. Creed had a masculine demeanor and appearance and presented herself as Christopher Creed. Over the course of her employment, Ms. Creed continued to come to terms with her gender identity and gradually changed her appearance to

2

look more feminine. Ms. Creed began wearing clear nail polish, trimming her eyebrows, and sometimes wore black mascara. In the fall of 2005, Ms. Creed started growing her hair out and began wearing it in a more feminine style. During this time, Ms. Creed also increasingly used the name "Amber." At all times during her employment, Ms. Creed wore Family Express's required unisex uniform consisting of a polo shirt and slacks.

Ms. Creed says her store manager, Dan Arthur, knew she identified as a female, and he spoke with her on several occasions about her gender transition. Ms. Creed says Mr. Arthur was supportive and urged her to continue her employment as a female. Co-workers Janice Dankert and Justin Mosely also knew Ms. Creed identified as a female, and they discussed her gender transition on several occasions.

Ms. Creed says that she met or exceeded Family Express's legitimate performance expectations and received positive feedback about her job performance throughout her employment. Ninety days after being hired, Ms. Creed received a raise and a rating of "very good" on her first professional development review. On her next review, Ms. Creed received another raise and a rating of "effective." Ms. Creed also received several positive customer comment cards and earned the "Greeter of the Month" award three times.

*Family Express's Grooming Policy.*

Family Express agrees that Ms. Creed performed her duties in a satisfactory

manner, but maintains that she didn't fulfill the conditions of her employment adequately because she refused to follow the company's sex-specific dress code and grooming policy. Family Express requires all of its employees to "maintain a conservative, socially acceptable general appearance, conceal all tattoos, take out all body piercing[s], and wear uniforms neatly, with shirts tucked in and belts worn." The policy's sex-specific portion requires males to maintain neat and conservative hair that is kept above the collar and prohibits earrings or any other jewelry that accompanies body piercing. Females also must maintain neat and conservative hair, which needn't be above the collar, and may wear makeup and jewelry so long as it is conservative and business-like. The Human Resources Department oversees all final decisions about whether an employee's appearance conforms with the policy.

Family Express places great importance on its dress code and grooming policy, claiming that it is vital to the company's competitive advantage in the market. To impress this point upon employees, the Director of Operations explains during the two-day orientation for new sales associates that the policy is a non-negotiable part of employment. Family Express claims that the policy is strictly enforced and evenly applied, with no exceptions allowed, and it submits documentary evidence of employee discipline to support this argument.

On December 2, 2005, Ms. Creed received a copy of the Family Express employee handbook, which sets forth the conduct policy for retail employees. The conduct policy provides that all employees must wear an approved uniform with

name tag, and the employee's general appearance must be clean, neat, and socially acceptable. The handbook references Family Express's dress code and grooming policy, which is kept in the operations manual maintained by the company. According to Ms. Creed, sales associates do not receive a copy of the operations manual or the dress code and grooming policy.

*Customer Complaints About Ms. Creed's Appearance*

Ms. Creed never received any complaints from customers about her feminine appearance. Indeed, many customers were extremely supportive of her gender transition and pleased with her performance, even going so far as to fill out positive comment cards and tell her that they only felt comfortable while she was working. Ms. Creed also maintains that Mr. Arthur never told her to change her appearance or that she was in violation of the dress code and grooming policy. Likewise, Mr. Arthur never expressed any concern that Ms. Creed would be terminated because of her appearance.

Family Express, on the other hand, asserts that Mr. Arthur received more than fifty complaints about Ms. Creed's appearance, and so contacted Director of Human Resources Cynthia Carlson to tell her that Ms. Creed wasn't in compliance with the dress code and grooming policy. Mr. Arthur testified that he believed Ms. Creed was a good employee, but her failure to conform to the policy was affecting her ability to do her job and was alienating customers.

Director of Operations Mike Berrier testified that Family Express received

a customer complaint about Ms. Creed's appearance on December 13, 2005. Mr. Berrier said the customer told him that she thought Ms. Creed was a wonderful employee, but that she felt uncomfortable with Ms. Creed's wearing makeup, nail polish, and a more feminine hairstyle. Mr. Berrier claimed that he received another complaint through the company website on either December 12 or 13, which stated that a store employee was dressing in a way that was a "male person, but female in appearance." Mr. Berrier also received an email from Ms. Carlson about her phone call from Mr. Arthur about Ms. Creed. Mr. Berrier noted that store employees never complained to him about Ms. Creed's appearance.

*Ms. Creed's Termination*

LeAnn McKinney, a district store manager, came to Store #51 on or around December 13. Ms. McKinney observed Ms. Creed's feminine appearance and told her that her hairstyle looked good. Shortly thereafter, Mr. Arthur told Ms. Creed that she had been called into a meeting with Mr. Berrier. On December 14, Ms. Creed met with Mr. Berrier and Ms. Carlson. Mr. Berrier and Ms. Carlson told her that they had received a complaint about her feminine appearance and that she could no longer present herself in a feminine manner at work. Ms. Creed told them that she was transgender and going through the process of gender transition. In response, Ms. Carlson asked her whether "it would kill her" to appear masculine for eight hours a day and asked her why she applied for a job if she knew she was undergoing gender transition. At that point, Mr. Berrier and

Ms. Carlson told her that if she didn't report to work "as a male" she would be terminated and that she had twenty-four hours to decide if she would present herself in a more masculine manner. When Ms. Creed told them she couldn't do so, they terminated her employment.

Ms. Creed contends that, during the meeting, neither Mr. Berrier nor Ms. Carlson told her that she was required to conform to the dress code and grooming policy. She alleges that the only statement made in reference to the policy was when Ms. Carlson said that she noticed Ms. Creed's hair was slightly below her collar. In response to this comment, Ms. Creed asked if it would be appropriate for Family Express to apply the female appearance standard to her and inquired about a possible relocation. Ms. Creed claims that Ms. Berrier and Mr. Carlson declined her requests.

As Family Express sees it, Mr. Berrier and Ms. Carlson explained to Ms. Creed that she would have to cut her hair and not wear nail polish and makeup or resign from her position as a sales associate. Mr. Berrier testified that neither he nor Ms. Carlson told Ms. Creed that she couldn't present herself in a feminine manner at work and denied hearing Ms. Carlson ask Ms. Creed whether it would kill her to appear as a man at work. Mr. Berrier alleges that Ms. Creed said that she wouldn't be able to conform with the dress code and grooming policy but didn't explain why; at which point, Family Express considered Ms. Creed's actions a "voluntary termination."

At his deposition, Mr. Berrier testified about the kind of characteristics he

considered to be more female, including hairstyle, body, physique, and voice. Mr. Berrier commented that he doesn't consider wearing makeup or painting fingernails to be masculine characteristics. Mr. Berrier also stated that Ms. Creed looked more female to him than usual at the termination meeting because of her makeup, hairstyle, and nail polish.

Following her termination, Ms. Creed posted the following blog entry, explaining that she had been fired earlier that day:

> "[t]hey told it was because I wasn't conforming to the dress-code policy of the company (which clearly is designed to separate gender associations and to maintain that the employees are 'socially acceptable by the majority of society' or in other words, politically correct.) . . . I was given a choice: Either conform to the policy, which would mean that I would have to cut my hair and stop wearing makup [sic] (specifically stated in the meeting several times) and conform my gender to my birth sex . . . or be terminated."

*Procedural History*

On March 10, 2006, Ms. Creed filed a charge of discrimination with the EEOC, complaining that she was treated in a discriminatory manner because of her sex. The EEOC issued a dismissal and notice of rights to Ms. Creed, and she filed her complaint seeking reinstatement to her former position or front pay in lieu of reinstatement, lost wages and employment-related benefits, compensatory damages, punitive damages, attorneys fees, costs, and pre-judgment interest on all sums recoverable.

Family Express moved to dismiss Ms. Creed's complaint for failure to state a claim upon which relief can be granted. The court granted the motion in part

and dismissed Counts II and IV, in which Ms. Creed claimed that she was discriminated against on the basis of her transgender status, holding that discrimination against transsexuals because they are transsexuals isn't discrimination "because of sex" as prohibited by Title VII. The court denied the motion as to Counts I and III, in which Ms. Creed contends that she was discriminated against because Family Express perceived her "to be a man who did not conform with gender stereotypes associated with men in our society, or because it perceived Plaintiff to be a woman who did not conform with gender stereotypes associated with women in our society." Family Express moved for summary judgment on the remaining counts, arguing that it didn't discriminate against Ms. Creed based on her sex but terminated her because she refused to comply with its sex-specific dress code and grooming policy.

DISCUSSION

Summary judgment is appropriate when "the pleadings, depositions, answers to the interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). In deciding whether a genuine issue of material fact exists, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). No genuine issue of material fact exists when a rational trier of fact could not find for the nonmoving

party even when the record as a whole is viewed in the light most favorable to the nonmoving party. O'Neal v. City of Chicago, 392 F.3d 909, 910-911 (7th Cir. 2004). A nonmoving party cannot rest on mere allegations or denials to overcome a motion for summary judgment; "instead, the nonmovant must present definite, competent evidence in rebuttal." Butts v. Aurora Health Care, Inc., 387 F.3d 921, 924 (7th Cir. 2004). Specifically, the nonmoving party must point to enough evidence to show the existence of each element of its case on which it will bear the burden at trial. Celotex v. Catrett, 477 U.S. 317, 322-323 (1986); Lawrence v. Kenosha Cty., 391 F.3d 837, 842 (7th Cir. 2004).

Ms. Creed alleges that Family Express discriminated against her based on her sex by terminating her for failure to comply with male stereotypes in violation of Title VII as well as the Indiana Civil Rights Act. As noted in the order on Family Express's motion to dismiss, because Indiana's definition of discrimination is similar to 42 U.S.C.A. § 2000e-2(a), Indiana courts construe this provision consistent with Title VII. Indiana Civil Rights Com'n v. Marion Cty Sheriff's Dept., 644 N.E.2d 913, 915 (Ind. Ct. App. 1994). Accordingly, the court applies the standard applicable in Title VII actions to Ms. Creed's claims under Indiana Code § 22-9-1-3.

Title VII prohibits an employer from harassing an employee "because of the employee's sex." Spearman v. Ford Motor Co., 231 F.3d 1080, 1084 (7th Cir. 2000) (citing Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 78 (1998)); 42 U.S.C. § 2000e-2(a)(1). Title VII doesn't allow an employer to treat employees

adversely because their appearance or conduct doesn't conform to stereotypical gender roles. *See* <u>Price Waterhouse v. Hopkins</u>, 490 U.S. 228, 250-251 (1989) (holding that the plaintiff's employer discriminated against her by acting on the basis of a belief that she wasn't conforming to the stereotypes associated with her gender); <u>Doe by Doe v. City of Belleville, Ill.</u>, 119 F.3d 563, 581 (7th Cir. 1997) ("[A] man who is harassed because his voice is soft, his physique is slight, his hair long, or because in some other respect he exhibits masculinity in a way that does not meet his coworkers' idea of how men are to appear and behave, is harassed 'because of his sex.'"), *vacated and remanded on other grounds,* <u>City of Belleville v. Doe</u>, 523 U.S. 1001 (1998).

Although discrimination because one's behavior doesn't conform to stereotypical ideas of one's gender may amount to actionable discrimination based on sex, harassment based on sexual preference or transgender status does not. *See* <u>Spearman v. Ford Motor Co.</u>, 231 F.3d at 1085; <u>Ulane v. Eastern Airlines, Inc.</u>, 742 F.2d 1081, 1085 (7th Cir. 1984). To sustain a claim based on sex stereotyping, then, a plaintiff must show that the employer actually relied on his or her gender in making an adverse employment decision. *See* <u>Hamm v. Weyauwega Milk Prods., Inc.</u>, 332 F.3d 1058, 1064 (7th Cir. 2003) (recognizing sex stereotyping claim under Title VII but holding that evidence didn't support the claim); <u>Smith v. City of Salem</u>, 378 F.3d 566, 575 (6th Cir. 2004) ("Sex stereotyping based on a person's gender non-conforming behavior is impermissible discrimination, irrespective of the cause of that behavior; a label, such as

'transsexual' is not fatal to a sex discrimination claim where the victim has suffered discrimination because of his or her gender nonconformity.").

*Family Express's Dress Code and Grooming Policy*

Family Express maintains that it didn't discriminate against Ms. Creed based on her gender because it relied on a uniformly applied, sex-specific dress code and grooming policy. In support, Family Express cites a line of cases finding that gender-specific dress and grooming codes don't violate Title VII so long as the codes don't disparately impact one sex or impose an unequal burden. *See e.g.,* Jespersen v. Harrah's Operating Co., Inc., 392 F.3d 1076 (9th Cir. 2004); Harper v. Blockbuster Entertainment Corp., 139 F.3d 1385 (11th Cir. 1998); Tavora v. New York Mercantile Exchange, 101 F.3d 907 (2nd Cir. 1996).

In Austin v. Wal-Mart Stores, Inc., this court denied the plaintiff's sex discrimination claim, holding that Wal-Mart's policy requiring male employees to have short hair didn't violate Title VII. 20 F. Supp. 2d 1254, 1256-1257 (N.D. Ind. 1998); *see also* Carroll v. Talman Fed. Sav. and Loan Ass'n of Chicago, 604 F.2d 1028, 1031 (7th Cir. 1979) (holding that dress code policy which required women to wear uniforms but only required men to require customary business attire discriminated against women in violation of Title VII). Similarly, in Jespersen v. Harrah's Operating Company, Inc., the Ninth Circuit ruled that Harrah's Casino's grooming standards requiring women to wear makeup and styled hair and men to dress conservatively wasn't discriminatory because the policy didn't impose an

12

unequal burden on either sex. 392 F.3d at 1078.

Family Express analogizes to <u>Jespersen</u>, claiming that its policy also applies to all employees, requires a unisex uniform, and doesn't single out males or females. Moreover, Family Express argues that its policy is justified in commonly accepted social norms and is reasonably related to its business needs. Like the policy in <u>Jespersen</u>, the dress code and grooming policy in this case doesn't take male or female mannerisms into account or appear to have a disparate impact on either sex. Likewise, the policy only applies to physical appearance and doesn't require an employee to behave in a certain manner. Accordingly, Family Express's requirement that male and female employees adhere to grooming standards matching their gender doesn't discriminate on the basis of sex. *Cf.* <u>Nichols v. Azteca Rest. Enters., Inc.</u>, 256 F.3d 864, 875 n.7 (9th Cir. 2001) (explaining that reasonable regulations that require male and female employees to conform to different dress and grooming standards do not necessarily constitute actionable discrimination under Title VII).

Regardless of whether Family Express's policy is valid under Title VII, however, Ms. Creed may succeed on her sex stereotyping claim if she can present sufficient evidence from which a rational jury could infer intentional discrimination. <u>Rogers v. City of Chicago</u>, 320 F.3d at 753; *see also* <u>Doe by Doe v. City of Belleville, Ill.</u>, 119 F.3d at 594 ("The fact that one motive was permissible does not exonerate the employer from liability under Title VII; the employee can still prevail so long as she shows that her sex played a motivating role in the

employer's decision."). Family Express can't shield such discrimination behind a valid dress code and grooming policy. *See e.g.,* <u>Etsitty v. Utah Transit Auth.</u>, 502 F.3d 1215, 1224-1227 (10th Cir. 2007) (finding that employer's requirement that employees use restrooms matching their biological sex didn't discriminate on the basis of sex but that plaintiff may demonstrate employer's alleged concern regarding restroom usage was pretext for discrimination based on the plaintiff's failure to conform to gender stereotypes). Even if the policy itself is non-discriminatory, Ms. Creed may prove that Family Express discriminated against her if she can show that her gender, not grooming policy violations, actually motivated her termination. *See e.g.,* <u>Venters v. City of Delphi</u>, 123 F.3d 956, 973 (7th Cir. 1997) (an employee can prevail under Title VII so long as an illicit criterion played a motivating role in her discharge, even if another, legitimate criterion also played a role).

*Ms. Creed's Proof of Sex Stereotyping*

Ms. Creed doesn't challenge Family Express's right to maintain a fair and reasonable appearance code, but rather, she claims that Family Express terminated her because she failed to conform to stereotypes about how a man should appear. Ms. Creed may establish her sex stereotyping claim under Title VII by either the "indirect method" or the "direct method" of proof. <u>Hossack v. Floor Covering Assocs. of Joliet, Inc.</u>, 492 F.3d 853, 860 (7th Cir. 2007); *see also* <u>Kampmier v. Emeritus Corp.</u>, 472 F.3d 930, 939 (7th Cir. 2007).

*Indirect Method of Proof*

Under the indirect method, Ms. Creed may establish a prima facie case of discrimination by demonstrating that: (1) she belongs to a protected class; (2) she performed her job satisfactorily; (3) she suffered an adverse employment action; and (4) Family Express treated similarly situated female employees more favorably. *See* <u>Spearman v. Ford Motor Co.</u>, 231 F.3d at 1087 (*citing* <u>Greenslade v. Chicago Sun-Times, Inc.</u>, 112 F.3d 853, 863 (7th Cir. 1997)). Upon such a showing, the burden shifts to Family Express to articulate a legitimate nondiscriminatory reason for terminating Ms. Creed. <u>Hossack v. Floor Covering Assocs.</u>, 492 F.3d at 860. If Family Express meets that burden, Ms. Creed bears the ultimate burden to show that Family Express's proffered reason is a pretext for sex discrimination. <u>Id</u> (*citing* <u>Barricks v. Eli Lilly and Co.</u>, 481 F.3d 556, 559 (7th Cir. 2007)).

Although the court has referred to Ms. Creed as female in this opinion in deference to her self-identification, she must be considered male for the purposes of Title VII. *See* <u>Spearman v. Ford Motor Co.</u>, 231 F.3d at 1084 ("Congress intended the term 'sex' to mean 'biological male or biological female.'") (citation omitted). The parties don't dispute that Ms. Creed is a member of a protected class based on her gender or that her termination was an adverse employment action. Similarly, both sides agree that Ms. Creed performed her job satisfactorily, apart from her violation of the dress code and grooming policy. Ms. Creed hasn't

produced evidence of a similarly situated female in violation of the dress code and grooming policy whose treatment could be compared to hers. Accordingly, Ms. Creed must rely on the direct method of proof. *See* <u>Hossack v. Floor Covering Assocs.</u>, 492 F.3d at 860.

*Direct Method of Proof*

To establish a prima facie case of sex stereotyping under the direct method, Ms. Creed must present evidence, either direct or circumstantial, that she wouldn't have been terminated but for her failure to conform to male stereotypes. *See* <u>Steinhauer v. DeGolier</u>, 359 F.3d 481, 485 (7th Cir. 2004). Direct evidence essentially requires an admission by the decisionmaker that the adverse employment action was "based on the prohibited animus." <u>Troupe v. May Dep't Stores Co.</u>, 20 F.3d 734, 736 (7th Cir. 1994); *see also* <u>Rudin v. Lincoln Land Comm. College</u>, 420 F.3d 712, 720 (7th Cir. 2005); <u>Hoffman v. Caterpillar, Inc.</u>, 256 F.3d 568, 576 (7th Cir. 2001) (noting that admissions of discriminatory intent are rarely encountered).

In addition to direct evidence, Ms. Creed may also proceed under the direct method by presenting a "convincing mosaic" of circumstantial evidence that points to a discriminatory reason for her termination. <u>Ptasznik v. St. Joseph's Hosp.</u>, 464 F.3d 691, 695 (7th Cir. 2006); *see also* <u>Adams v. Wal-Mart Stores, Inc.</u>, 324 F.3d 935, 939 (7th Cir. 2003). Unlike direct evidence, circumstantial evidence "need not directly demonstrate discriminatory intent, but rather it 'allows a jury to infer

intentional discrimination by the decisionmaker' from suspicious words or actions.'" <u>Hossack v. Floor Covering Assocs.</u>, 492 F.3d at 860 (*citing* <u>Rogers v. City of Chicago</u>, 320 F.3d 748, 753 (7th Cir. 2003)). There are three types of circumstantial evidence of particular relevance when establishing an inference of intentional discrimination: (1) dubious coincidences such as suspicious timing, ambiguous statements, and comments or behavior directed at employees in the protected group; (2) evidence that the employer systematically treated similarly situated employees outside the protected group better; and (3) evidence that the plaintiff was qualified for the job and the employer's reason for treating her differently was a mere pretext for discrimination. *See* <u>Hassan v. Foley & Lardner LLP</u>, 2008 WL 5205818 at *8 (7th Cir. Dec. 15, 2008) (citing <u>Troupe v. May Dep't Stores Co.</u>, 20 F.3d at 736).

Ms. Creed offers a variety of facts that purportedly create an inference of discrimination. She relies heavily on the comments made by Mr. Berrier and Ms. Carlson during the termination meeting. Ms. Creed alleges that after she informed Mr. Berrier and Ms. Carlson that she was going through a gender transition, Ms. Carlson asked her whether "it would kill [her] to appear masculine for eight hours a day" and why she applied for the job if she knew she would be undergoing a gender transition. Ms. Creed says she was told that she had to report to work "as a male." Ms. Creed also points to Mr. Berrier's deposition testimony in which he admitted that he thought Ms. Creed didn't look like the same person because of her feminine appearance, and he didn't consider wearing makeup or having long

hair to be masculine characteristics.

These statements, Ms. Creed argues, reveal that Family Express terminated her because her mannerisms didn't conform with its expectations of how a man should look. Family Express claims Mr. Berrier and Ms. Carlson simply were articulating the fact that Ms. Creed was in violation of its dress code and grooming policy.[1] Construing the parties' contradictory statements in Ms. Creed's favor, this evidence alone can't establish that Family Express wouldn't have terminated Ms. Creed but for her gender. While Ms. Carlson's comments, in particular, were insensitive of Ms. Creed being in the process of coming to terms with her gender identity, these comments in and of themselves don't establish that Family Express fired Ms. Creed because she wasn't "male" enough.

The statements simply do not allow a trier of fact to decide that Family Express acted on the basis of a prohibited purpose — Ms. Creed's failure to embody sexual stereotypes — as opposed to a legitimate non-discriminatory purpose — breach of the grooming policy — or even for what is, under today's law, a legitimate discriminatory purpose — because Ms. Creed was transgender. Remarks with such ambiguity do not amount to proof under the direct method sufficient to create a genuine issue of material fact. See, e.g., Petts v. Rockledge

---

[1] Family Express rebuts Ms. Creed's claim that Mr. Berrier and Ms. Carlson never explicitly told her that she in violation of the dress code by evidence of her blog post from the day she was terminated. In that post, Ms. Creed stated that she lost her job, and "[t]hey told me it was because I wasn't conforming to the dress-code policy of the company . . . ." Ms. Creed further acknowledged that she was given a choice to either conform to the policy or be terminated.

<u>Furniture</u>, 534 F.3d 715, 720-722 (7th Cir. 2008) (reference to plaintiff as "mother of the store" not proof of gender bias); <u>Tubergen v. St. Vincent Hosp. and Health Care Ctr., Inc.</u>, 517 F.3d 470, 475 (7th Cir. 2008) ("old guard" not necessarily reference to chronological age).

Ms. Creed also relies on the timing of her termination as evidence of discriminatory animus, pointing out that she was fired shortly after her co-workers and store manager began to notice changes in her appearance. Family Express claims it received numerous complaints about her appearance, but Ms. Creed wasn't notified of these complaints, or that she was in violation of the company's policy, until the day of her termination. Mr. Berrier and Ms. Carlson fired Ms. Creed on the spot after she informed them that she couldn't conform her appearance to the male standard. Mere temporal proximity alone, however, is insufficient to establish a genuine issue of material fact. *See* <u>Tubergen v. St. Vincent Hosp. & Heath Care Ctr., Inc.</u>, 517 F.3d 470, 473-474 (7th Cir. 2008); *see also* <u>Wyninger v. New Venture Gear, Inc.</u>, 361 F.3d 965, 981 (7th Cir. 2004). As a result, Ms. Creed must rely on evidence in addition to the timing of her termination in order to proceed under the direct method of proof.

To meet this burden, Ms. Creed alleges that Family Express's explanation for her termination was merely a pretext for discrimination. First, she claims that Family Express gave shifting reasons for her termination. According to Ms. Creed, Family Express initially told her that it called the termination meeting because it received customer complaints about her appearance. In support, Family Express

submitted affidavits from Ms. Creed's co-workers claiming that her appearance was affecting her performance. Despite these representations, Family Express ultimately told Ms. Creed that she was being fired for violating the dress code and grooming policy. Ms. Creed disputes the inference that her performance was unsatisfactory, noting that she received positive reviews and the greeter of the month on numerous occasions. Family Express agrees that it didn't fire Ms. Creed based on her performance: the complaints merely alerted Family Express to Ms. Creed's violation of its policy, which is strictly enforced regardless of whether the company receives complaints about an employee.

Second, Ms. Creed argues that a negative inference should be drawn from Family Express's inability to produce copies of the alleged customer complaints during discovery. Family Express couldn't produce copies of the complaint Ms. Carlson received via the internet because the claims website had been deleted, and Mr. Berrier couldn't locate the notes which documented the customer complaint received via telephone. There is no evidence of bad faith destruction of documents, and the complaints themselves weren't relevant to Family Express's decision to enforce its dress code and grooming policy.

To prove pretext, Ms. Creed must establish that Family Express gave a dishonest explanation for its actions. *See* Grube v. Lau Indust., Inc., 257 F.3d 723, 730 (7th Cir. 2001) (pretext "means something worse than a business error; pretext means deceit used to cover one's tracks."); Kulumani v. Blue Cross Blue Shield Ass'n, 224 F.3d 681, 684 (7th Cir. 2000). If Family Express acted in good

faith, the court can't second-guess its actions regardless of whether those actions constitute a prudent business decision. Leonberger v. Martin Marietta Materials, Inc., 231 F.3d 396, 399 (7th Cir. 2000); *see also* Green v. Nat'l Steel Corp., 197 F.3d 894, 899 (7th Cir. 1999).

Ms. Creed hasn't shown that Family Express's decision to terminate her was a lie or had no basis in fact. *See* Mills v. Health Care Serv. Corp., 171 F.3d 450, 458 (7th Cir. 1999). Family Express presented evidence that it applies its dress code and grooming policy uniformly to all employees; in fact, Family Express terminated several other employees for policy violations. Ms. Creed might argue that real-life experience as a member of the female gender is an inherent part of her non-conforming gender behavior, such that Family Express's dress code and grooming policy discriminates on the basis of her transgender status, but rightly or wrongly, Title VII's prohibition on sex discrimination doesn't extend so far. *See* Etsitty v. Utah Transit Auth., 502 F.3d at 1224. As already explained, Ms. Creed's Title VII claim must rest entirely on the theory of protection as a man who fails to conform to sex stereotypes. While the court may disagree with Family Express that a male-to-female transsexual's intent to present herself according to her gender identity should be considered a violation of its dress code and grooming policy, that is not the issue the law places before the court. The summary judgment record contains too little evidence to permit an inference that Family Express didn't actually terminate Ms. Creed for this legally permissible reason. The totality of Ms. Creed's evidence creates no genuine issue of material fact that Family

Express terminated her based on her gender.

Ms. Creed hasn't presented sufficient evidence of discriminatory motivation which would allow a jury to reasonably infer that Family Express terminated her for failing to meet its masculine stereotypes. Ms. Creed hasn't carried her burden on her sex discrimination claim, and Family Express is entitled to summary judgment.

CONCLUSION

For the foregoing reasons, the court GRANTS the defendant's motion for summary judgment [Doc. No. 34]. The clerk shall enter judgment accordingly.

SO ORDERED.

ENTERED: January 5, 2009

_____/s/ Robert L. Miller, Jr._____
Chief Judge
United States District Court